## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sara Boykin, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **(JURY TRIAL DEMANDED)** |
| project44, Inc., | |
| Defendant. | |

Plaintiff Sara Boykin ("Plaintiff" or "Boykin"), for her Complaint against Defendant project44, Inc. (name intentionally left in lower case) ("project44" or "Defendant"), states and alleges as follows:

### INTRODUCTION

Boykin is an experienced and highly successful account executive with a long history of more than 30 years of positive employment and stellar sales results.  In 2022, Boykin decided to leave SPS Commerce.  After job hunting for only one week, she received multiple employment offers.

Defendant approached and hired Boykin.  She started her employment on April 4, 2022.  Yet only five months later, and despite Boykin's already significant sales success and her receipt of a company-wide sales award, Defendant fired Boykin within days after she informed Defendant that it was confirmed that she was suffering from a serious brain disorder, Idiopathic Intercranial Hypertension ("IIH").  Boykin's termination was in violation of her rights under the Americans with Disabilities Act of 1990 (the "ADA") and

the Minnesota Human Rights Act (the "MHRA"). Boykin therefore brings this action as a result of Defendant's illegal discriminatory conduct.

## PARTIES

1. Boykin is a resident and citizen of Minnesota.

2. Upon information and belief, Defendant project44 is incorporated under the laws of Delaware with its headquarters in Chicago, Illinois and has more than 500 employees.

## VENUE AND JURISDICTION

3. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

4. This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because several of Boykin's claims arise under the ADA.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because a substantial part of the events, conduct, or omissions giving rise to Plaintiff's claim occurred in this district and much of the harm that Plaintiff suffered was directed at and occurred in this district.

## BACKGROUND

6. In March of 2022, Boykin decided that she wanted to make a career move.

7. Boykin began searching for a new position.

8. Defendant approached Boykin through a headhunter and recruited her because of her long-time, successful track record in sales.

9.    Defendant's website claims that it is "the leading supply chain visibility platform."

10.    Defendant's website also indicates that:

> project44 is on a mission to make supply chains work. As the supply chain connective tissue, project44 operates the world's most trusted end-to-end visibility platform that tracks more than 1 billion unique shipments annually for over 1,300 of the world's leading brands, including top companies in manufacturing, automotive, retail, life sciences, food & beverage, CPG, and oil, chemical & gas. Using project44, shippers and carriers across the globe drive greater predictability, resiliency and sustainability.

11.    Defendant's website further states that "project44 is headquartered in Chicago with a diverse team spanning 23 global offices including Austin, Amsterdam, Kraków, Paris, São Paulo, Shanghai and Tokyo."

12.    Boykin was hired to sell supply chain management software. Boykin had substantial prior and extremely successful experience selling different types of software but was new to the sales of supply management software.

13.    When hiring Boykin, Defendant was aware that she had no prior experience in the sale of supply chain management software. During the interview process, when Boykin questioned her to make sure that she was a good fit for the position, she was assured by her future supervisor that it would be no problem and that he would train her. During Boykin's employment, however, her supervisor never took the time to train Boykin and he spent very little other time with her.

14.    Despite Boykin's lack of experience with the sale of supply chain management software, Defendant was nonetheless extremely motivated to hire Boykin and

quickly pushed her through its hiring process.

15.     Defendant offered Boykin a $60,000.00 signing bonus to encourage her to reject a competing job offer that she had received from NICE InContact, an offer that Boykin had told Defendant that she was planning to accept.

16.     Defendant also agreed to pay Boykin an annual salary of $160,000.00, to grant her 20,000 stock options with a four-year vesting period, and to provide her with a dedicated sales development representative whose sole job would be to help Boykin to generate potential sales leads.  In addition, Boykin was to be paid 10% base commission on all of her sales up to the amount on her sales quota.  If Boykin exceeded her sales quota, she would be paid an additional 14.9% in commissions on her sales (for a total of 24.9% in commissions).  She was to be paid 7% commission on all of the services she sold. Boykin would also have benefits and all expenses paid.

17.     In reliance on Defendant's representations and offer, Boykin declined the competing job offer from NICE InContact and began her employment with Defendant on April 4, 2022, principally working from her home in Minnesota.

18.     Shortly after Boykin started with Defendant, her dedicated sales development representative left Defendant for reasons unrelated to Boykin.

19.     Defendant failed to replace Boykin's promised dedicated sales development representative during the remainder of her tenure at project44.

20.     Boykin nonetheless effectively performed all of her own sales prospecting and lead generation, put together sales decks, set up internal meetings, did the majority of client facing communications, set up internal preparation calls and reviews, did all of the

follow up with potential customers, and put together the pricing for potential deals.

21.    Despite the fact that this was the first time Boykin had sold this type of software and she was working without the assistance of a dedicated sales development representative during the majority of her short tenure at project44, Boykin nonetheless achieved impressive prospecting and pending sales results.  For example, as set forth below, after only three months at project44, Boykin won an internal, company-wide sales contest.  Boykin built a significant pipeline of business for Defendant that included Target, Kohl's, Best Buy USA, Best Buy Canada, Walmart, Walmart Canada, Macy's, The Home Depot, Sonepar, Gilead, Walgreens, PriceSmart, and others.

22.    Among other things, Boykin got verbal commitments for software business from The Home Depot, Target, and Kohl's.  At the time of her firing, two of those potential deals, with Target and Kohl's, were already in redline, that is, drafts of the respective sales contracts between Defendant and Target, and Defendant and Kohl's, were already being circulated between the parties.

23.    Boykin's Target sale has the potential to exceed $2 million in revenue for Defendant while the first portion of the Kohl's deal sold by Boykin will likely produce more than $300,000.00 in revenue for Defendant.  The Home Depot deal that Boykin sold will bring in more than $2 million in revenue.

24.    In June of 2022, project44 paid thousands of dollars in membership fees so that Boykin could join Chief, a women's leadership organization whose members are top executives in various fields of business.

25.    On or around May 8, 2022, Boykin contracted COVID-19 and immediately informed her supervisor.

26.    Despite her illness, Boykin did not take time off.  She worked every business day even though she was ill, including traveling to attend two different trade shows, one in Chicago and one in Orlando, shortly after she was no longer contagious but still feeling extremely sick and suffering from the side effects of COVID-19, including difficulty focusing, temporary memory loss, extreme fatigue, body aches, headaches, ear buzzing, and vision loss.

27.    Boykin also continued to perform her other job duties while suffering from COVID-19, including speaking with and completing the necessary follow-up with potential clients; preparing her sales decks; continuing to generate sales leads, scheduling and conducting meetings; and performing other duties needed to get business for Defendant.

28.    In early July, Defendant announced that Boykin had won an internal project44 sales contest, which was company-wide and included all of Defendant's sales representatives, because Boykin had generated the most sales leads during the contest period.  For her win, Defendant awarded Boykin a bonus of $1,500.00.

29.    In July, Boykin still had not yet fully recovered from COVID-19, a fact she frequently communicated to her supervisor and others at project44.  She was still suffering from lingering COVID-19 symptoms and shared her ongoing symptoms with her supervisor and others at project44.

30.     On July 10, 2022, Ms. Boykin went to the emergency room after having a sudden severe rush of pain to her head.  She was given a number of tests, including a CT scan.

31.     Several days later, Boykin was diagnosed with suspected IIH, a serious and rare brain disorder involving elevated cerebrospinal fluid pressure of unknown cause.  The excess cerebrospinal fluid pushes up into the brain, causing the signs and symptoms of a brain tumor, which Boykin was experiencing.

32.     Immediately thereafter, Boykin called her supervisor to inform him that she likely had IIH.  She asked her supervisor to be patient because she was very sick.

33.     Boykin was extremely ill as a result of the IIH.  Among other things, Boykin was extremely fatigued, was having difficulty concentrating, had ringing ears, and was experiencing vision loss.

34.     Again, despite her ongoing and now even more serious medical issues relating to the IIH, Boykin continued to perform all of her job duties.

35.     Boykin maintained her work performance even though she was undergoing extensive medical care, including visits with neurologists and her family doctor.

36.     In August, after Boykin told her supervisor about the IIH diagnosis, Boykin had a routine check-in telephone call with Defendant's chief sales officer.  For the first time ever, he chided her for failing to complete certain business forms for her potential client, The Home Depot, before she had that check-in call with him.

37.     The business forms Boykin was being chided about were part of a sale training program called Force Management.  But Boykin had not yet taken Force

Management training when the chief sales officer took her to task about not using its forms. But Defendant had not even scheduled Boykin to begin the twelve-week training program for Force Management until September 6, 2022.

38.    In addition, Boykin's telephone call with the chief sales officer was the first time that someone from Defendant had informed Boykin that she was supposed to complete the Force Management forms before such calls.

39.    This was also the first check-in call with the chief sales officer that occurred after Boykin had informed her supervisor that she was suffering from IIH.

40.    Before this particular call, Boykin had never been asked, much less required, to complete any Force Management forms for purposes of these check-in calls.  In every earlier check-in call Boykin had pertaining to her sales progress, including as to her work with The Home Depot, she had been asked to provide only a simple update of her current activity in landing those accounts.  This was the first time Boykin had any negative interaction with anyone at project44. And Boykin had never received any negative feedback about her performance in writing.  In fact, Boykin repeatedly asked for feedback on her performance and was always given positive accolades.

41.    After that call, Boykin immediately began to prepare all of the Force Management forms for all of the deals she had in the pipeline, completing them quickly on nights and weekends, even though she had not yet been trained on the Force Management program.   She taught herself how to do the forms.

42.    On August 30, 2022, Boykin had an appointment with her neurologist and he confirmed her diagnoses of IIH.

43.     After the appointment, Boykin called her supervisor and told him that she definitely had IIH.  She further reported that there was now a plan to put her brain disorder in remission but that she would occasionally need to take some time off from work on the days when she was scheduled to get various additional medical tests, like a lumbar spinal puncture and a CT scan, as well as to attend various doctor appointments.

44.     Boykin also asked her supervisor for some understanding, patience, and help while she recovered from her still-lingering COVID-19 symptoms and could hopefully get her brain disorder under control.

45.     One week later, on September 6, 2022, Boykin was asked to join a call with her supervisor and a human resources ("HR") person.  Boykin's supervisor fired her during the call.  He claimed that others alleged that Boykin was not performing adequately.  When Boykin asked for clarification, he hung up, leaving Boykin on the phone with just the HR person.

46.     Defendant's firing of Boykin was done with malice and/or reckless disregard of her rights as a person disabled under terms of both the ADA and MHRA.

47.     Defendant deliberately and intentionally disregarded Boykin's rights and disregarded the substantial likelihood of serious injury and damages to Boykin as a result of Defendant's wrongful termination of Boykin after she disclosed the IIH diagnosis.

48.     Before Defendant fired Boykin, Defendant never engaged in any interactive process with Boykin to determine whether reasonable accommodations for Boykin were possible.

49.    When Boykin subsequently asked that HR person why Boykin had been

fired, the HR person alleged in a September 13, 2022 email that:

> Your employment with p44 was terminated as your overall performance
> was unacceptable and did not meet p44's standards.  For instance, while
> you were successful at building a strong pipeline, your pitch presentations
> continued to require the help from your manager and 1-2 support for every
> client call, feedback received from the Last Mile AEs, Pre-Sales, Growth
> Team, Marketing and peer AEs has been all negative, and at the latest sales
> summit in Chicago, you were not engaged and did not spend any time in
> the office with the team and left early both days.

50.    The allegations in that email are pretextual and false.  In fact, the proffered

reasons confirm Boykin's claim that she improperly suffered adverse employment

consequences because of her illness and disability.

51.    As the quoted email conceded, Boykin had already built "a strong pipeline,"

something she had accomplished in less than six months at project44.  Boykin's pipeline

of oncoming business included a number of significant, national companies that project44

had never done business with before Boykin started, and she had leveraged her contacts

and significant sales experience to open those important doors for Defendant.

52.    In other words, Boykin was succeeding in the job she had been hired to do,

a success confirmed by her victory in Defendant's company-wide sales contest less than

two months before she was terminated.

53.    To criticize Boykin for allegedly requiring "help" is both false and

unjustified.  *First*, Boykin was performing virtually all of the work needed for and

associated with her sales efforts and her pipeline by herself.  *Second*, when Boykin was

terminated, she was still a very new employee who had not received all of the training

Defendant had scheduled for her to take and she was still learning about various matters. *Third,* Boykin had been repeatedly told to use her resources on every call because project44 is a "Team Sale." Moreover, even though Boykin had not yet been trained in the Force Management program, she was nonetheless able to teach herself how to fill in the forms associated with that program, thus not requiring "help." *Fourth*, Defendant hired Boykin knowing she had had no experience in selling supply chain software before it hired her. *Fifth*, as a condition of Boykin's acceptance of Defendant's offer of employment, Defendant was required to provide Boykin with a dedicated sales development representative who would assist only Boykin. Despite that, Boykin spent virtually all of her time in Defendant's employ without having the benefit of such a representative. *Sixth*, Boykin's significant health issues, coming down with both COVID-19 culminating in IIH, would certainly explain why Boykin may have needed some help. Thus, even if Defendant's claim that Boykin had needed "help" were assumed to be true, the foregoing circumstances readily explain the reasons why that might be the case.

54.    But Defendant's allegations regarding Boykin's improper use of help are baseless. While employed by Defendant, Boykin scheduled and started the majority of her sales meetings and internal meetings, performed all of the preparation and follow-up, both directly with potential clients as well as internally, formulated client strategy and put together all of the sales decks herself while using proper input from the team as directed by her supervisor. Boykin was never given any feedback that she should be doing anything differently.

11

55.     Boykin also made the majority of her client calls on her own, and only brought in other employees as appropriate for larger meetings.  In addition, Boykin was repeatedly told that project44's sales process was a "team sell" and that she was doing what she was supposed to be doing by collaborating with the team, many of whom gave Boykin positive feedback during her employment.

56.     Boykin's supervisor as well as others at project44 were aware that Boykin might be facing challenges in the short term as a result of her newly arisen disability, and it was only logical that she might seek some help in various areas as a result.

57.     Despite that, Boykin sought no additional assistance from Defendant after her diagnosis.

58.     Although Boykin disputes that she was using help in a manner that was "unacceptable" or beneath "p44's standards," as alleged in Defendant's September 11th email, the fact that Defendant would rely on Boykin's alleged usage of help from others as justification for her termination is in direct conflict with Defendant's legal obligations to Boykin given her disability.

59.     Nor is it true that Boykin's performance was deficient during the Chicago sales summit in July of 2022.  Boykin did interact with team members in Defendant's Chicago office, was paying attention during the sales summit presentations, and did not leave the presentations early on either day, even though she was still suffering from lingering symptoms of COVID-19 as well as the onset of what turned out to be the symptoms of her serious brain disorder.

60.     Rather Boykin attended all of the presentations and only left the presentations during scheduled break times.   Other company employees, however, left presentations while they were still in session and some employees left the presentations for hours at a time.

61.     Specifically, on Boykin's first day in Chicago for the sales summit, she went to the local office of the Chief women's organization to network, a business development idea that Boykin's supervisor had approved before she went to Chicago.

62.     The first night of the sales summit, Boykin went to dinner early and left the dinner around 8:30 p.m., but only after she was told that she should leave because she was not feeling well.   Other project44 employees, who were not suffering from lingering symptoms of COVID-19, also left the dinner at that point in time and some did not even attend the dinner.

63.      Boykin did not leave the sales summit early on the second and final day. Contrary to the allegations in the September 11th email, after the presentations at the sales summit ended, Boykin did go to Defendant's office for a while and visited with colleagues and was one of the very last people to leave.

64.     Boykin did not leave the venue of the sales summit until well after all the presentations had finished.   In addition, Boykin booked her flight home to Minnesota in accordance with the instructions and schedule Defendant had sent out to employees before the sales summit.

65.     Boykin thus discharged her obligations regarding the Chicago sales summit even though she was still suffering from the adverse effects of COVID-19.

66.    Moreover, after that sales summit, Boykin did not receive one contemporaneous word of criticism, reprimand, or warning about her performance at the sales summit before her termination on September 6, 2022. The allegations in the September 11 email are thus not only demonstrably false but also highly suspicious given that time lag between the sales summit and Boykin's termination.

67.    Boykin's personnel file is also devoid of any criticism of her.

68.    In fact, Boykin had never received any written or verbal reprimands or any warnings about any element of her job performance before her termination in the September 6, 2022, other than the chiding she received from Defendant's chief sales officer about failing to fill out the forms associated with a training that she had not yet taken. And the chief sales officer's chiding occurred only **after** Boykin informed her supervisor about her IIH diagnosis.

69.    And Boykin's termination occurred immediately **after** she had asked her supervisor for a minimal, short-term accommodation, specifically to take some occasional time off on those days that she had doctors' appointments or medical tests that would hopefully put the IIH into remission.

70.    Just days after her firing, Boykin received a spinal tap where four vials of fluid were removed from her brain, and she began to get better. Her fatigue disappeared, the ringing in her ears stopped, her memory improved, and her eyesight improved. The IIH is well on its way to full remission.

71.     Before Boykin informed Defendant of her IIH diagnosis and asked for that minimal and extremely reasonable accommodation, all of the feedback she had received regarding her performance had been extremely positive.

72.     Indeed, just two months before, Boykin had won a company-wide sales contest, outperforming all of Defendant's other sales representatives.

73.     Despite that, Defendant claimed that Boykin's job performance was deficient, a pretextual allegation belied by the irrefutable evidence of the substantial, national prospects and sales transactions that Boykin brought in during her short tenure with Defendant.

74.     Boykin's favorable reviews shortly before her termination and her victory in the sales context are strong evidence that the reasons Defendant gave for her termination are pretextual.

75.     In fact, it was only after Ms. Boykin informed her supervisor that she would be requesting some time off to receive the medical care needed for the IIH that she was fired, within days of that conversation between Boykin and her supervisor.

76.     Boykin has suffered and continues to suffer substantial damages as a result of project44's unlawful termination and other violations of both the ADA and the MHRA. Among other things, Boykin gave up another outstanding position to take the job at project44, and that other offer is no longer available.  In addition, the job market had worsened significantly since Boykin had started at project44 which made her job search much more challenging.

77.     Boykin is depressed, emotionally and physically distressed, and stigmatized because of project44's illegal termination, its false statements regarding her job performance, and its failure to engage in an interactive process, and its discriminatory refusal to grant her the reasonable accommodations she requested.

78.     On December 31, 2022, Boykin filed a charge of discrimination with the Minnesota Department of Human Rights.

## COUNT I
### (Illegal Termination in Violation of the ADA, 42 U.S.C. § 12181 *et seq.*)

79.     Boykin reincorporates the foregoing paragraphs as though fully set forth herein.

80.     [P]roject44 is subject to the ADA because it is engaged in an industry affecting commerce and it has had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current and preceding calendar year.  42 U.S.C. § 12111; 29 C.F.R. § 1630.2(e)(1).

81.     The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).

82.     Under the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* 42 U.S.C. § 12102(2)(A).

83.     Boykin is a qualified, disabled person under the ADA because she has IIH.

84.     Boykin disclosed the IIH to her supervisor at project44 immediately after her diagnosis, and thus there is a record of her disability.

85.     A known effect of IIH, when it is not in remission, is a substantial limitation in a person's ability to think or concentrate.  Boykin was beginning to suffer from this aspect of IIH after her diagnosis and is thus disabled for purposes of the ADA.

86.     Despite having IIH, Boykin was still qualified to perform the essential functions of her job, and she in fact continued to perform her job duties satisfactorily even though ill, including her ongoing development of substantial prospects that either had already purchased or would purchase software from Defendant.

87.     Even though Boykin continued to successfully perform her job, she was terminated in violation of the ADA after she asked her supervisor for a reasonable, short-term accommodation, specifically to occasionally take a minimal amount of time off on those days she was receiving the medical care necessary to bring her IIH into remission.

88.     Boykin's termination is an adverse employment action under the ADA.

89.     Boykin's significant sales accomplishments during such a short period of employment, her ongoing work even while she was suffering from a significant illness and then a serious brain disorder as well, her victory in company's sales contest, the pretextual and improper nature of the alleged reasons for her termination, and shortness of time between her request for time off for medical treatment and her termination all demonstrate that Boykin was wrongfully terminated in violation of the ADA.

90.     In wrongfully terminating Boykin after she communicated her IIH diagnosis, Defendant engaged in intentional discrimination against Boykin and Defendant has done

so with malice and/or with reckless indifference to the federally protected rights of Boykin an aggrieved individual.

91.    In addition, Defendant deliberately and intentionally disregarded Boykin's rights and disregarded the substantial likelihood of serious injury and damages to Boykin as a result of Defendant's wrongful termination of Boykin after she disclosed the IIH diagnosis.

92.    As a direct result of project44's improper termination of Boykin in violation of the ADA, Boykin has suffered damages, including, among other things, compensatory damages, punitive damages, a loss of substantial past and future earnings and earnings capacity, including, without limitation, the commissions she would have been paid for the sales transactions and substantial customers that she brought to Defendant as a direct result of her stellar sales performance, medical expenses, and the loss of her stock options..

93.    Boykin has also suffered and continues to suffer severe mental and emotional distress as a result of her termination in retaliation for her disability, which has and will continue.  Boykin has incurred and is still incurring mental and emotional health care provider expenses as a result of her illegal termination.

94.    Boykin's damages as a result of Defendant's illegal termination are in excess of $75,000.00, plus costs and attorneys' fees, in an amount to be determined at trial.

## COUNT II

**(Denial of a Request for a Reasonable Accommodation or to Otherwise Engage in an Interactive Process in Violation of the ADA, 42 U.S.C. § 12181 *et seq.*)**

95.     Boykin reincorporates the foregoing paragraphs as though fully set forth herein.

96.     The ADA also requires that an employer must:

> [M]ak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an ... employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].

42 U.S.C. § 12112(b)(5)(A).

97.     The ADA further provides that:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).

98.     In August of 2020, Boykin asks her supervisor for a reasonable, short-term accommodation, specifically to take several hours off occasionally but only during those days when she had doctors' appointments or medical tests.

99.     Boykin was instead fired within days after her request for that minimal reasonable accommodation.

100.     Boykin's requested accommodation would not impose an undue hardship on Defendant's business operations.

101.    Defendant never engaged in any type of interactive process to determine whether reasonable accommodations for Boykin were possible.

102.    Defendant's failure to engage in an interactive process with Boykin to determine whether reasonable accommodations were possible is prima facie evidence that Defendant was acting in bad faith.

103.    In failing to engage Boykin in an interactive process and failing to agree to provide Boykin with reasonable accommodations after she communicated her IIH diagnosis, Defendant engaged in intentional discrimination against Boykin and Defendant has done so with malice or with reckless indifference to the federally protected rights of Boykin an aggrieved individual.

104.    One of the alleged justifications for Boykin's termination was her supposedly improper need for help when developing clients and sales.

105.    In addition to Boykin's request for an extremely limited amount of time off, it would have been reasonable and appropriate to provide Boykin with the dedicated sales development representative that Defendant was already obliged to provide her pursuant to Defendant's offer of employment.

106.    Under the ADA, providing Boykin with a dedicated sales development representative, as Defendant was required to do, would have been just the sort of accommodation that project44 could have offered Boykin to assist in her performance of her job in the event that the IIH would impact her ability to do her job.  Instead, project44 fired her for allegedly needing help.

107.    Defendant did not provide Boykin with reasonable accommodations for her disability or engage in an interactive process with her.

108.    Defendant's misconduct in failing to provide Boykin was reasonable accommodations or to engage in an interactive process are also violations of the ADA.

109.    As a direct result of project44's additional violations of the ADA, Boykin has suffered damages, including, among other things, compensatory damages, punitive damages, medical expenses, the loss of her stock options, and a loss of substantial past and future earnings and earnings capacity, including, without limitation, the commissions she would have been paid for the sales transactions and substantial customers that she brought to Defendant as a direct result of her stellar sales performance.

110.    Boykin has also suffered and continues to suffer severe mental and emotional distress as a result of Defendant's failure to provide her with any reasonable accommodations or to engage in an interactive process in retaliation for her disability, which has and will continue.  Boykin has incurred and is still incurring mental and emotional health care provider expenses as a result of Defendant's violations of the ADA.

111.    Boykin's damages as a result of Defendant's illegal failure to provide her with any reasonable accommodation or to engage in an interactive process are in excess of $75,000.00, plus costs and attorneys' fees, in an amount to be determined at trial.

## COUNT III
### (Illegal Termination in Violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*)

112.    Boykin reincorporates the foregoing paragraphs as though fully set forth herein.

21

113.    The Minnesota Human Rights Act ("MHRA") provides in pertinent part that:

Except when based on a bona fide occupational qualification, it is an unfair employment practice for an employer, because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, familial status, membership or activity in a local commission, disability, sexual orientation, or age to … discharge an employee.

Minn. Stat. § 363A.08, subd. 2.

114.    [P]roject44 is subject to the MHRA because it is engaged in an industry affecting commerce and it has had fifteen or more part-time or full-time employees for each working day in each of twenty or more calendar weeks in the current and preceding calendar year.  *See* Minn. Stat. § 363A.08, subd. 6(a).

115.    The MHRA further provides that:

'Disability' means any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.

Minn. Stat. § 363A.03, subd. 12.

116.    Boykin has IIH.  A known effect of IIH, when it is not in remission, is a substantial limitation in a person's ability to think or concentrate.  Boykin was beginning to suffer from this aspect of IIH after her diagnosis and is thus disabled for purposes of the MHRA.

117.    Boykin informed her supervisor and other employees at project44 of her IIH right after she received the diagnosis, and thus there is a record of her disability.

118.   Under the MHRA, a qualified disabled person with respect to employment is defined as one who "with reasonable accommodation can perform the essential functions required of all applicants for the job in question." Minn. Stat. § 363A.03, subd. 36.

119.   Boykin is a qualified, disabled person under the MHRA because despite having IIH, Boykin was still qualified to perform the essential functions of her job, and she in fact continued to perform her job duties satisfactorily even though ill, including her ongoing development of substantial prospects that either had already purchased or would purchase software from Defendant.

120.   Even though Boykin continued to successfully perform her job, she was terminated in violation of the MHRA after she informed her supervisor of the confirmation of her IIH diagnosis and asked her supervisor for a reasonable, short-term accommodation, specifically to occasionally take a minimal amount of time off on those days she was receiving the medical care necessary to bring her IIH into remission.

121.   Boykin's termination is an adverse employment action under the MHRA.

122.   Defendant deliberately and intentionally disregarded Boykin's rights and disregarded the substantial likelihood of serious injury and damages to Boykin as a result of Defendant's wrongful termination of Boykin after she disclosed the IIH diagnosis.

123.   Boykin's significant sales accomplishments during such a short period of employment, her ongoing work even while she was suffering from a significant illness and then a serious brain disorder as well, her victory in company's sales contest, the pretextual and improper nature of the alleged reasons for her termination, and shortness of time between her request for time off for medical treatment and her termination all demonstrate

that Boykin was wrongfully terminated in violation of the MHRA.

124.    As a direct result of project44's improper termination of Boykin in violation of the MHRA, Boykin has suffered damages, including, among other things, compensatory damages, treble damages, punitive damages, medical expenses, the loss of her stock options, and a loss of substantial past and future earnings and earnings capacity, including, without limitation, the commissions and other amounts that she would have been paid for the sales transactions and substantial customers that she brought to Defendant as a direct result of her stellar sales performance.   Boykin achieved that success even though a substantial share of her prospecting and sales activity occurred while she was suffering significant symptoms from COVID-19 and then IIH.

125.    Boykin has also suffered and continues to suffer severe mental and emotional distress as a result of her termination in retaliation for her disability, which has and will continue.   Boykin has incurred and is still incurring mental and emotional health care provider expenses as a result of her illegal termination in violation of the MHRA.

126.    Boykin's damages as a result of Defendant's illegal termination are in excess of $75,000.00, plus costs and attorneys' fees, in an amount to be determined at trial.

## COUNT IV
**(Denial of a Request for a Reasonable Accommodation or to Otherwise Engage in an Interactive Process in Violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*)**

127.    Boykin reincorporates the foregoing paragraphs as though fully set forth herein.

128.    The MHRA provides that:

[I]t is an unfair employment practice for an employer … not to provide a reasonable accommodation for a … qualified employee with a disability unless the employer, agency, or organization can demonstrate that the accommodation would impose an undue hardship on the business, agency, or organization. 'Reasonable accommodation' means steps which must be taken to accommodate the known physical or mental limitations of a qualified individual with a disability.

Minn. Stat. § 363A.08, subd. 6(a).

129.    The MHRA also requires an employer to engage in "an informal, interactive process with the individual with a disability in need of the accommodation," and that "this process should identify the limitations resulting from the disability and any potential reasonable accommodations that could overcome those limitations."   Minn. Stat. § 363A.08, subd. 6(a).

130.    In addition, when determining whether an accommodation would impose an undue hardship on an employer, the MHRA also requires an employer to have "**documented** good faith efforts to explore less restrictive or less expensive alternatives, including consultation with the disabled person or with knowledgeable disabled persons or organizations."  Minn. Stat. § 363A.08, subd. 6(b)(5) (emphasis added).

131.    In August of 2020, Boykin asked her supervisor for an extremely reasonable, short-term accommodation, specifically to take several hours off occasionally but only during those days when she had doctors' appointments or medical tests.

132.    Boykin's requested accommodation would not impose an undue hardship on Defendant's business operations.

133.   Defendant, however, did not provide Boykin with any reasonable accommodation for her disability.

134.   Boykin was instead fired within days after she asked her supervisor for the reasonable accommodation related to minimal time off when she was seeing the doctor or obtaining medical tests.

135.   Defendant also failed to engage in any type of interactive process to determine whether any reasonable accommodation for Boykin was possible.

136.   Defendant's failure to engage in an interactive process with Boykin to determine whether reasonable accommodations were possible is prima facie evidence that Defendant was acting in bad faith.

137.   Upon information and belief, Defendant never engaged in "documented good faith efforts to explore less restrictive or less expensive alternatives," as required by Minn. Stat. § 363A.08, subd. 6(b)(5).

138.   One of the alleged justifications for Boykin's termination was her supposedly improper need for help when developing clients and sales.

139.   In addition to Boykin's request for an extremely limited amount of time off, it would have been reasonable and appropriate to provide Boykin with the dedicated sales development representative that Defendant had agreed to provide for her pursuant to Defendant's offer of employment.

140.   Under the MHRA, providing Boykin with a dedicated sales development representative, as Defendant was already required to do, would have been just the sort of accommodation that project44 could have offered Boykin to assist in her performance of

her job in the event that the IIH was affecting her ability to do her job. Instead, project44 fired her for allegedly needing help.

141. Defendant's misconduct in failing to provide Boykin was reasonable accommodations or to engage in an interactive process are also violations of the MHRA.

142. Defendant deliberately and intentionally disregarded Boykin's rights and disregarded the substantial likelihood of serious injury and damages to Boykin as a result of Defendant's failure to provide Boykin with reasonable accommodations and failure to engage or document its engagement in an interactive process after she disclosed the IIH diagnosis.

143. As a direct result of project44's additional violations of the MHRA, Boykin has suffered damages, including, among other things, compensatory damages, punitive damages, treble damages, medical expenses, the loss of her stock options, and a loss of substantial past and future earnings and earnings capacity, including, without limitation, the commissions she would have been paid for the sales transactions and substantial customers that she brought to Defendant as a direct result of her stellar sales performance.

144. Boykin has also suffered and continues to suffer severe mental and emotional distress as a result of Defendant's failure to provide her with any reasonable accommodations or to engage in an interactive process in retaliation for her disability, which has and will continue. Boykin has incurred and is still incurring mental and emotional health care provider expenses as a result of Defendant's violations of the MHRA.

145.    Boykin's damages as a result of Defendant's illegal failure to provide her with any reasonable accommodation or to engage in an interactive process are in excess of $75,000.00, plus costs and attorneys' fees, in an amount to be determined at trial.

**WHEREFORE**, Boykin requests judgment in her favor and against Defendant awarding her:

a.  An award of damages in an amount according to be proven at trial for compensatory damages, treble damages, punitive damages, lost past and future earnings and earnings capacity, for past and future medical, mental and emotional health care provider expense; together with prejudgment and post-judgment interest;

b.  An award of Boykin's attorneys' fees, costs, expenses, and prejudgment interest thereon; and

c.  Such other such relief as the Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Boykin demands a jury trial as to all claims so triable.

Dated:  July 7, 2023                              **BERENS & MILLER, P.A.**

<u>s/Barbara Podlucky Berens</u>
Barbara Podlucky Berens, #209788
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
(612) 349-6171
bberens@berensmiller.com

*Attorneys for Plaintiff Sara Boykin*